# Attachment E

# AMERICA **2030** CAPITAL LIMITED

## Investment Banking/Stock Loans

### MASTER LOAN AGREEMENT

Non-Recourse Non-Title Transfer Loan

Between

**PRESCIENT INVESTMENT LIMITED**, as Borrower

And

**AMERICA 2030 CAPITAL LIMITED**, as Lender

NOTE:* this Agreement is null and void or subject to unfavorable change to Borrower unless executed by Borrower within five (5) Business Days of its receipt. Documents may be accepted or rejected after five (5) days after the original date sent.

DATED ___ OF _May_ 2018

R00015

## MASTER LOAN AGREEMENT

This Master Loan Agreement supersedes all pervious term sheets and discussions and is the final documentation of the Parties' undertakings which is entered into and effective on the date of mutual execution hereof by and between:

**PRESCIENT INVESTMENT LIMITED** for itself, representatives, affiliates, and assigns, with a principal place of business located at 10 Floor, Guangdong Investment Tower, 148 Connaught Road Central, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("**Borrower**");

**AND**

**AMERICA 2030 CAPITAL LIMITED**, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("**Lender**").

Borrower and Lender are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

## SECTION 1

## DEFINITIONS

1.1    **Defined Terms.** As used in this Agreement and any other agreement(s) entered into by the Parties, the following terms shall have the following meanings:

"**Agreement**" shall mean this Master Loan Agreement, including any Exhibits or Schedules hereto, and as amended or supplemented from time to time, or as incorporated by reference into subsequent agreements.

"**Approved Loan Amount**" shall mean the maximum amount the Lender is willing to the fund the Loan.

"**Business Day**" shall mean the working day of a calendar week, except Saturday, Sunday and public holidays in accordance with relevant applicable laws.

R00016

**"Breach"** shall mean any of the Events of Default specified in this Agreement and other Loan Documents that constitute a default unless specified otherwise.

**"Closing Date"** shall mean the day in which the Pledged Collateral has been delivered to and confirmed by the Depository Broker.

**"Closing Statement"** shall mean a statement in the form attached to this Agreement as Exhibit 1, which Closing Statement shall be delivered by Lender to Borrower following the delivery of the Pledged Collateral to the Depository Broker.

**"Currency"** the Loan and all interest and fees shall be in United States of American Dollars ("USD"). If the Pledged Collateral is a security which is priced and traded in a market and currency other than USD, the Parties agree to convert to USD for all purposes.

**"Depository Broker"** shall mean the financial institution selected by Lender for the receipt of the Pledged Collateral and any top-up.

**"Event of Default"** shall mean any of the events specified in Section 7.1 hereof.

**"Fair Market Price" ("FMP")** shall mean with respect to the stock or securities provided as Pledged Collateral the average of the last sale price on three (3) consecutive Business Days prior to closing. That average price shall be the per-share price of the Pledged Collateral used to establish its fair market value ("FMV").

**"FMV"** shall mean the amount, expressed in US dollars, equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares comprising the Pledged Collateral.

**"Issuer"** shall mean the corporate entity that has distributed shares of PHARMALLY INTERNATIONAL HOLDINGS CO LTD (6452:TT).

**"Lender's Remedy"** shall mean termination of the Loan and forfeiture of the Pledged Collateral in accordance with Section 7.2 *infra*.

R00017

**"Lien"** shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest, or encumbrance of any kind in respect of such asset.

**"Loan"** shall mean the total contractual gross amount lent to Borrower by Lender on a nonrecourse basis for the specified term and subject to the stated conditions.

**"Loan Principal Amount"** shall mean the amount of monies borrowed by Borrower from Lender under Section 2.1 hereof.

**"Loan Documents"** shall mean collectively, this Agreement, the Power of Attorney, the Closing Statement, and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner so as to give meaning and effect to all their provisions.

**"Maturity Date"** shall have the meaning provided in Section 2.6(a).

**"Party"** shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

**"Proof of Funds"** shall mean cash or liquid securities.

**"Term of the Loan"** shall mean when the Loan starts as defined by Verification Day and ends as defined by Maturity Date.

**"Pledged Collateral"** shall mean the actual shares delivered to Lender as a consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change of the Pledged Collateral.

**"Valuation Event"** shall mean that the FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Loan Principal Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange.

R00018

"**Verification Day**" shall mean the Business Day after the Pledged Collateral has been received and posted to Lender's account prior to Closing Date.

2    **Use of Defined Terms.** All terms defined in this Agreement shall have such defined meanings when used herein and in any other Loan Documents made or delivered in conjunction with this Loan transaction.

3    **Lender's Discretion.** Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date.

4    **Statements as to Knowledge.** Any statements, representations, or warranties which are based upon the knowledge of Borrower shall be deemed to have been made after due inquiry with respect to the matter in question but without Borrower being required to seek an opinion of counsel with respect thereto.

## SECTION 2
## MATERIAL TERMS OF THE LOAN

### 2.1    Loan Principal Amount.

(a)    Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to one hundred seventeen million ($117,000,000.00) USD ("**Approved Loan Amount**") of the current FMV of the Pledged Collateral. The Loan Principal Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository Broker and shall be memorialized in a Closing Statement as example in the form of Exhibit 1 hereto, which is hereby incorporated by reference.

(b)    Where the Loan is repaid in full at maturity, Borrower shall be entitled to all of the appreciation in the FMV of the Collateral, if any.

(c)    For purposes of Section 2.1(c), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) sixty percent (60%) of the Pledged Collateral by (ii) the FMV.

R00019

(d)     Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding.

## 2.2   Interest Rate.

(a)     All outstanding amounts of the Loan shall bear an interest rate in an amount equal to four and fifty nine hundredths percent (4.59%) per year to be paid to Lender in quarterly installments and on the Maturity Date. Interest payment shall be collected in advance of the Loan and shall accrue daily both before and after any Event of Default, demand, court judgment, or arbitral award, and shall be calculated on the basis of the actual number of days elapsed and on the basis of a year of three hundred and sixty five (365) days (three hundred and sixty six (366) days in a leap year).

(b)     Subsequent interest payments for the Loan shall be due on the first Business Day of the third month following the applicable previous interest installment payment, and such payment shall be based on a quarter year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due. All subsequent payments (except otherwise noted herein) shall be due on the first Working Day of each third month thereafter for the Term defined in Section 2.5 (as such Term may be extended) until the Maturity Date.

(c)     Subject to Section 2.1, all interests due hereunder shall be paid in or its value determined in U.S. dollars and made by way of certified check, wire transfer or other immediately available funds as directed by Lender.

(d)     All payments regarding interest, fees, principal, or otherwise shall be remitted via certified funds to the address included in the Closing Statement.

## 2.3   Prepayment. There shall be no prepayment ("Prepayment") of the Loan Principal Amount or of any interest due under the Loan permitted during the first thirty six (36) months of the Term, except any payments to be received pursuant to a Change in Collateral event. Borrower may prepay the Loan Principal Amount after the lock-up period, but shall be subject to a two percent (2%) prepayment fee.

## 2.4   Fees.

R00020

(a)    **Loan Origination Fee.** Contemporaneous with the funding of the Loan by Lender, Borrower shall pay to Lender an agreed upon Loan origination fee of three percent (3%) of the Loan Principal Amount ("**Lender's Origination Fee**"). Lender is authorized to deduct the Origination Fee from the Loan Principal Amount.

(b)    **Loan Maintenance Fee.** Borrower shall pay to Lender an annual maintenance fee of thirty five hundredths of a percent (0.35%) of the Loan Principal Amount ("**Lender's Maintenance Fee**"). Lender is authorized to deduct in advance the Maintenance Fee from the Loan Principal Amount for the first year and the same shall be paid, automatically and without further demand, by Borrower on each anniversary of the Loan thereafter for all the years constituting the Term of the Loan.

(c)    **Third Party Expenses.** Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement. For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year fee is deducted from the Loan proceeds.

(d)    **Break-Up Fee.** In the event that Borrower fails to deliver the Pledged Collateral after execution of this Agreement, then there shall be a Break-Up Fee equal to five percent (5%) of the FMV of the Approved Loan Amount, whether or not the Pledged Collateral was delivered to the Depository Broker. The Break-Up Fee, also known as Liquidated Damages Fee or Rescission Fee, is effective upon the due execution of this Agreement by both Parties, and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to the Depository Broker. This five percent (5%) Break-Up Fee applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which are covered under Section 7 of this Agreement.

2.5    **Extra Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, Borrower has the right to request that Lender increase the Loan Principal Amount at the same Loan to Value (LTV) as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount, up to the full FMV of the Pledged Collateral at

R00021

the time of the written request. Borrower may exercise this provision no more than once every six (6) months.

## 2.6    Term of the Loan and Maturity Date of Loan.

(a)    The Loan shall mature, and the Loan Principal Amount together with all accrued interest thereon shall be due and payable, three (3) years subsequent to the occurrence of the Closing Date (the "Maturity Date" or "Maturity").

(b)    The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Loan Principal Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date at the prevailing annual interest rate at the time of extension.

(c)    No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Loan Principal Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Loan Principal Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "Proof of Funds").

2.7    Closing. The Closing Date shall be no later than three (3) Business Days after the Verification Day, assuming the conditions to Lender's obligations set forth in Section 6 herein are satisfied. The balance payment ("Balance Payment") shall be paid within three (3) Business Days of the written receipt by Lender of a confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker. The Balance Payment shall mean the Loan Principal Amount less any Origination Fee, costs, or expenses, if applicable and as set forth in the Closing Statement, not satisfied in cash by Borrower. The Balance Payment shall be settled (paid) to Borrower's account per the following instructions:

| Bank/Institution Name | China Citic Bank International Limited |
|---|---|
| Swift Code No/Routing Number | KWHKHKHH |

R00022

| Account Number | 694-1-92096301 |
|---|---|
| Account Name | Prescient Investment Limited |
| Address of Account | 10/F, Guangdong Investment Tower, 148 Connaught Road, Central, Hong Kong |

2.8    **Payment of Principal Amount and Interest on Maturity Date.** Repayment of the Loan Principal Amount plus any other obligations due to Lender, including but not limited to interest due on the Loan Principal Amount, shall be made on the Maturity Date. If the overdue Loan Principal Amount and other obligations are not received by Lender within three (3) Business Days of the original due date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement.

2.9    **Loan Termination and Redelivery of the Pledged Collateral.** In the event that Borrower fails to deliver the Pledged Collateral to the Depository Broker, this Agreement shall become null and void. This Agreement shall terminate when all of Borrower's obligations have been paid in full. Lender confirms and will maintain its full ability to return the Pledged Collateral, or an equivalent number of Issuer securities at the FMV or equivalent, to Borrower, free of any encumbrance within five (5) Business Days of Borrower's satisfaction of its obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. For the purpose of this Agreement, a return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, reclassification, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral.

**SECTION 3**

**NATURE OF LOAN AND THE PLEDGED COLLATERAL**

3.1    **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of the obligations and will not make any claim or institute any

R00023

action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral.

3.2    **Lender's Appointment of Depository Broker**. Lender shall have the exclusive right to appoint a "Depository Broker" (a securities broker/dealer licensed in the local jurisdiction that receives and manages the Pledged Collateral) for the purpose of receiving and possessing the Pledged Collateral.

3.3    **Lender's Choice of Custodian of the Pledged Collateral.** Lender shall have the choice to designate any of its affiliates, representatives, assigns, or any third party of its choice as the Custodian of the Pledged Collateral being transferred to the Depository Account(s).

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants to Lender that:

4.1    **Capacity.** Borrower has sole legal and equitable title to the Pledged Collateral or as corporate officer or director, Borrower has good and lawful authority to deliver all of the Pledged Collateral in the manner hereby contemplated to the possession of Lender.

4.2    **No Liens or Restrictions.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities. Borrower covenants that so long as the Loan or any obligations to Lender remain outstanding and unpaid, Borrower shall not create, assume, or suffer to exist any Lien of any kind upon any of the Pledged Collateral.

4.3    **Non-Reliance.** Borrower is not relying on Lender for purposes of trading in securities or retaining Lender to facilitate stock trades for the Borrower or on behalf of the Borrower. Borrower further represents and warrants hat it has not relied, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication.

Borrower has not relied on any marketing materials or any other statements of fact prior to entering into this agreement, and any such materials and/or statements shall be purged from existence as

R00024

if never having existed. This Agreement shall be controlling and fully merged. Borrower understands and concedes that Lender is not a broker-dealer under Hong Kong securities laws or any acts or regulations related thereto and that Lender is not engaging in the business of buying and selling securities for its own accounts or the accounts of others or facilitating trades or effecting transactions in the securities for the account(s) of others.

Borrower represents and warrants that it understands and agreed that only a registered broker-dealer can facilitate stock trades in accordance with Hong Kong Securities Laws. It is the intent of the Parties that the Lender will only control and encumber the Pledged Collateral in accordance with this Agreement as inducement for the Lender to extend financing.

Borrower represents, warrants, and covenants that is has not entered into the subject Agreement to trade in stock or to circumvent the requirement that stock trades are only to be facilitated by a registered broker-dealer in accordance with applicable Hong Kong laws.

Borrower represents, warrants, and covenants that it understands that securities borrowing is highly speculative and requires sophistication and that Borrower may lose and forfeit the Pledged Collateral when engaging in margin borrowing. Borrower should only attempt margin trading if Borrower completely understands its potential losses; is a seasoned speculative securities investor; and has solid risk management strategies in place.

4.4    **Cooperation.** Borrower will cooperate in executing any document provided by Lender, Lender's Depository Broker, and clearinghouse/registry as required by applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction. This duty attaches upon the due execution of this Agreement and endures until its termination, whether by reason of Default or the fulfillment of all obligations thereunder. Willful failure to execute a document required or reasonably necessary in the course of this Agreement shall constitute and Event of Default.

4.5    **Professional/Accredited Investor.** Borrower, along with its directors, officers, and shareholders, is a professional/accredited investor under Hong Kong law, U.S. law, and the law of the domicile of the Parties and understands and acknowledges that owning securities or borrowing against them creates uncertain and unpredictable risk which outcome may substantially reduce or collapse their value. Borrower understands that as a result of the risk associated with margining securities, Borrower may lose all of the securities and their entire value. Borrower is versed in the knowledge of securities borrowing and the inherent risks such speculative activity may bring.

R00025

4.6    __Waiver__. Borrower will not seek injunctive relief or remedy from any court of law, regulatory body, transfer agent, or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate and an incurable default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement and the same shall be a Breach thereof.

Borrower will not take any action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement. It is hereby agreed that third parties such as the Depository Broker, Transfer Agent, referral sources or other affiliates, agents, or assignees of Lender facilitating the scope of this Agreement are hereby indemnified, released, forever discharged and absolved from any claim, controversy or action whatsoever. The latter provision is to supplement and incorporate Section 7 and Section 8.


## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF LENDER

Lender represents and warrants to Borrower that:


5.1    __Selling, Trading, and Re-Pledging__. Lender is not engaged and will not engage, directly or indirectly, in selling any security by borrowing the shares from any entity or person and later buying shares in the same security, then returning the borrowed shares in an effort to make a profit. Nor will Lender re-pledge or hypothecate the shares to anyone. Lender will not sell or trade in the shares for any reason whatsoever unless disposition of the shares is warranted, assuming a default, Lender is not limited to provisions of Section 7.1 and 9.9 of this Agreement.


5.2    __Risk Management__. In order to conform with governmental regulations and regulatory protocol regarding lender reserve requirements and risk management, Lender will take those actions warranted to safeguard and preserve Lender's Pledged Collateral as part of its compliance program and general risk management strategy. Lender reserves the right to confirm and verify the transfer of Pledged Collateral in accordance with its policy.

5.3     **Dividends, Interest, and Other Distributions.** Lender shall return to Borrower all dividends, if any received, within 5 business days after dividends are received. No dividends will be returned to Borrower if they are not paid by issuer to the Depository Broker for any reason whatsoever.

5.4     **Voting Rights and Powers.** Borrower is entitled to exercise all voting or other such consensual rights and powers until the security interest is enforced. Lender will not exercise any voting or other such consensual rights or powers under the terms of this Master Loan Agreement. All voting rights are to remain with the Borrower.

5.5     **Best Efforts Approach.** Despite stock market volatility, trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety.

## SECTION 6
### CONDITIONS TO LENDER'S OBLIGATIONS

6.1     **Conditions Precedent.** The obligation of Lender to make the Loan is subject to the fulfillment of the following conditions precedent (to the satisfaction of Lender):

    (a)     The delivery of duly executed Master Loan Agreement and Power of Attorney;

    (b)     The delivery of the stock in electronic form representing the Pledged Collateral; and

    (c)     That all matters, documentations, and other instruments in connection with the Loan are satisfactory in form and substance to Lender and its counsel.

6.2     **Market Conditions.** Should the Pledged Collateral experience a material Valuation Event or material change in average daily trading volume prior to funding, Lender shall have the right to cease the funding of the Loan until such circumstances are dissipated or cured. The Pledged Collateral to remain with Lender.

## SECTION 7
### EVENTS OF DEFAULT AND REMEDIES

R00027

7.1    **Events of Default**. An "Event of Default" shall exist if any one or more of the following occurs:

(a)    Failure by Borrower to pay the interest and applicable fees when due or the Approved Loan Amount when due or any other default in the performance of an obligation that is not cured within the applicable cure time;

(b)    If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading;

(c)    If the class of securities provided as Pledged Collateral is delisted or trading is halted for more than two (2) Business Days by a regulatory agency or otherwise;

(d)    If Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties;

(e)    A decrease in the daily trading volume of Issuer securities of more than fifty percent (50%) cumulatively for three (3) consecutive trading days below the average daily trading volume for Issuer securities for the three (3) month period preceding the Closing Date, and remains below for one (1) trading day after the trading day first falls below, then the Borrower shall within seven (7) Business Days, without further demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to twenty percent (20%) of the FMV of pledged securities and cure the deficiency;

(f)    If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null or void or the validity or enforceability thereof shall be contested by Borrower or by any other Person. If any action in any court, arbitration, or any other like dispute resolution proceeding is filed regarding this Agreement;

(g)    If a Valuation Event occurs and Borrower fails to cure such Valuation Event as provided herein. A Valuation Event shall mean that the current FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Loan Principal Amount, as reflected by the average of the last sale price on three (3) consecutive Business Days on a

R00028

national or international securities exchange (the "Default Floor"). If a Valuation Event occurs, then the Borrower shall, without further demand and within seven (7) Business Days, automatically transfer to the Depository Broker a one-time top-up her of shares or cash equal to twenty percent (20%) of the FMV of pledged collateral and cure the deficiency;

(h)     If Lender does not receive Borrower's written Proof of Funds under Section 2.6(c) no later than thirty (30) calendar days prior to the Maturity Date of the Loan; or

(i)     If the Issuer of the Pledged Collateral is notified by the appropriate regulatory agency that it is out of compliance or subject to sanction or restriction; or

(j)     If the Issuer of the Pledged Collateral experiences a material adverse event that would impact either its earnings, credit report rating, or underwriting recommendation.

7.2     **Lender's Remedy**. Lender shall not and will not have any recourse or remedy or any course of action against Borrower for Breach of this Agreement, other than occurrence of any of the foregoing Event(s) of Default, if not cured within the designated cure period, if applicable, shall terminate the Master Loan Agreement, result in acceleration of all Loan amounts, interest, expenses, and fees due thereunder, and cause forfeiture of the Pledged Collateral.

## SECTION 8

## Indemnity and Limitation of Liability

8.1     Neither party shall be liable for any indirect, incidental, opportunity loss, or consequential damages, including loss of revenue or profits or losses arising from its normal course of business, even if a Party has been advised of the possibility of such damages.

1.    8.2          Borrower shall not hold Lender responsible for any fluctuations in the value of the Pledged Collateral that Borrower may experience during the pendency of the Loan.

## SECTION 9

## MISCELLANEOUS

R00029

9.1    **Notices.** All notices and communications to either of the Parties by the other shall be in writing, sent by overnight mail by a reputable commercial carrier or electronically and shall be deemed duly given on the earlier of the date the same is sent, if via electronic communications, or received, when deposited in the mail, postage prepaid, as follows:

If to Lender: AMERICA 2030 CAPITAL LIMITED
Attention: Mark Bentley, Director of Operations
Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,
Sheung Wan, Hong Kong

If to Borrower: PRESCIENT INVESTMENT LIMITED
10/F Guangdong Investment Tower, 148 Connaught Road,
Central, Hong Kong

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

9.2    **Severability.** If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision is modified to meet legal conformity or, if impracticable, is stricken out entirely as if it were never included and the remainder of the rights and obligations contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect.

9.3    **Survival.** Except as herein provided, all representations, warranties, and covenants made in this Agreement shall survive the execution, delivery, and termination of this Agreement.

9.4    **Gender and Number.** Unless the context otherwise requires, when used herein, the singular includes the plural, and vice-versa, and the masculine includes the feminine and neuter, and vice-versa.

9.5    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

R00030

9.6     **Confidentiality**. This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("**Confidential Information**") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of the Loan Documents. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency, unless ordered to do so by court of law.

9.7     **Force Majeure**. Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("**Force Majeure Event**"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, degradation in stock value, stock market crash, illiquidity of the stock and other adverse market conditions, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

The Party affected by the Force Majeure Event shall promptly notify the other Party of the estimated extent and duration of such inability to perform its obligations hereunder. This Agreement shall remain in force until such time that the affected Party can perform.

9.8     **Assignment**. This Agreement shall be freely transferrable or assignable as the parties may see fit. Any transfer or assign action by either party shall be followed up by written notice to the other in accordance with Section 9.1 *infra*.

9.9     **Entire Agreement**. This Agreement contains the entire agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof.

9.10    **Amendments**. Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) shall not be effective unless in writing and signed by authorized signatories on behalf of both Parties.

R00031

9.11 **Disclaimer.** IT IS MUTUALLY UNDERSTOOD AND AGREED THAT LENDER HAS FINANCIAL INTEREST AND PRIVILEGE IN THE PLEDGED SHARES PURSUANT TO THE PARTIES' UNDERSTANDING AND CONTRACTUAL AGREEMENT. BORROWER HAS NOT AND WILL NOT RELY ON ANY MARKETING MATERIAL OR STATEMENTS OF MATERIAL FACT MADE BY SALES AGENTS OR LENDER PRIOR TO, DURING, OR FOLLOWING THE CLOSING OF THIS TRANSACTION. ALL SUCH STATEMENTS AND MARKETING MATERIAL ARE HEREBY PURGED FROM THIS LOAN AGREEMENT AS THOUGH NO MARKETING MATERIAL EVER EXISTED OR STATEMENTS OF MATERIAL FACT WERE EVER MADE. BORROWER ATTESTS THAT, AT ALL TIMES, IT WAS REPRESENTED BY LEGAL COUNSEL AND/OR BORROWER HAS HAD AMPLE OPPORTUNITY TO CONSULT ONE. BORROWER'S DECISION IS AT WILL AND SOLELY BASED ON ITS INDEPENDENT JUDGMENT. BORROWER HAS NOT BEEN DECLARED BY ANY COURT OF LAW TO BE INCOMPETENT OR OF NOT SOUND MIND. BORROWER IS FREE OF ANY EXTERNAL INFLUENCE OF OTHERS OR INFLUENCE OF DRUGS OR ALCOHOL WHEN CONSIDERING OR ENTERING INTO THIS AGREEMENT. BORROWER'S MIND IS FREE OF INFLUENCES OF DURESS, BODILY THREATS, TORTURE, KIDNAPING, EXTORTION, OR COERCION. BORROWER HAS EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER, IF ANY. BORROWER UNDERSTANDS THAT MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING. FUNDING CORRELATES AND IS RELATIVE TO TRADING VOLUME AND MAY BE IN TRANCHES. LENDER AGREES TO FOLLOW THE TRUTH IN LENDING ACT AND DOES NOT DISCRIMINATE ON THE BASIS OF SEX, RACE, NATIONALITY, OR RELIGION. BORROWER ASSUMES THE BURDEN OF TOPPING UP WHEN REQUIRED TO DO SO. BORROWER IS AWARE THAT MARKET CONDITIONS MAY CAUSE THE VALUE OF SECURITIES TO DECLINE. BORROWER CONCEDES THAT LENDER IS NOT RESPONSIBLE FOR THE DEGRADATION OF THE STOCK VALUE, WHETHER OWING TO AN ACTION(S) OR INACTION(S) OF LENDER. A DECLINE IN VALUE MAY REQUIRE ADDITIONAL SECURITIES OR CASH TO INCREASE THE VALUE OF THE COLLATERAL. A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES. INJUNCTIVE RELIEF APPLICATION BY BORROWER AND ANY INTERFERENCE BY THE DEPOSITORY AGENCY ARE NOT ALLOWED. BORROWER HEREBY WAIVES AND FOREVER DISCHARGES LENDER AGAINST ANY AND ALL CLAIMS UNDER SECURITIES LAWS. TAX CONSEQUENCES ARE THE RESPONSIBILITY OF BORROWER. WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN

R00032

ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING. BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION. LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND RESELL PRIOR TO FUNDING. LENDER HAS THE PRIVILEGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS. LENDER AND ITS LOAN OFFICERS HAVE NOT PROVIDED LEGAL OR TAX ADVICE OF ANY KIND TO BORROWER. BORROWER IS TO CONSULT A TAX PROFESSIONAL FOR ANY TAX ADVICE. NEITHER BORROWER NOR LENDER HAVE RECEIVED A KICK-BACK OR BRIBE OF ANY KIND IN ORDER TO INDUCE LENDER TO PROVIDE A FINANCING FACILITY. LENDER IS NOT A BROKER-DEALER OR FINANCIAL ADVISOR. THIS DISCLOSURE PROVIDES FULL TRANSPARENCY OF RISKS INVOLVED. LENDER IS NOT COMPENSATED BY ANY THIRD PARTY. NEITHER BORROWER NOR LENDER WILL PARTICIPATE IN OR ENGAGE IN ANY MONEY LAUNDERING SCHEME. THERE ARE NO PENDING NOR HAVE THERE BEEN ANY LAWSUITS OF ANY TYPE AGAINST LENDER IN ANY JURISDICTION OR COUNTRY. LENDER HAS NEVER BEEN SANCTIONED NOR FINED BY ANY AUTHORITY OR JURISDICTION. LENDER DOES NOT PROVIDE INVESTMENT ADVICE AND ITS LOAN OFFICERS AND SALES STAFF ARE PROHIBITED FROM DOING SO. BORROWER MUST INSURE THAT THE PLEDGED COLLATERAL STAYS WITHIN LENDER'S VALUE REQUIREMENT IN ACCORDANCE WITH THE MASTER LOAN AGREEMENT. LENDER WILL NOT BE LIABLE FOR DEVALUATION OF SECURITIES DURING THE TERM OF THE LOAN. LENDER IS NOT AN INSIDER OF THE SECURITIES BEING PLEDGED BY BORROWER AND LENDER DOES NOT AND HAS NOT OFFERED TO BUY OR SELL ADVICE TO BORROWER. LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL. A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER. BORROWER WILL NOT USE LOAN PROCEEDS FOR ANY ILLEGAL ACTIVITY, INCLUDING WITHOUT LIMITATIONS, USE OF LOAN PROCEEDS IN DRUG TRADE OR SUPPORT OF TERRORIST GROUPS. BORROWER WILL NOT TRANSACT WITH ANY ENTITY ON ANY INTERNATIONAL SANCTIONED LIST. LENDER IS NOT AFFILIATED WITH ANY GOVERNMENT AGENCY. BORROWER AGREES THAT THE LOAN IS SUITABLE FOR BORROWER'S NEEDS. LENDER HAS THE RIGHT, BUT NOT THE OBLIGATION, TO

R00033

REFINANCE OR INCREASE LOAN AMOUNT IF THE VALUE OF SECURITIES INCREASE DURING THE TERM OF THE LOAN. BORROWER HAS RISK-TOLERANCE AND HAS FINANCIAL ABILITY AND LIQUID ASSETS TO POST MARGIN IN THE EVENT OF DEFAULT. BORROWER REPRESENTS THAT IT IS NOT AFFILIATED WITH ANY U.S. STOCK EXCHANGE. BORROWER REPRESENTS THAT BORROWER HAS FULL OWNERSHIP OF THE SECURITIES AND LEGAL CUSTODY AND AS OF THE DATE OF THIS AGREEMENT, IS NOT A DEFENDANT IN ANY LAWSUIT WHERE THE OWNERSHIP AND CONTROL OF THE PLEDGED SHARES ARE CHALLENGED BECAUSE LENDER WILL NOT BE A PARTY TO ANY SUCH CHALLENGE. THERE SHALL BE NO REMEMDY OTHER THAN THAT WHICH IS PROVIDED FOR IN THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year written below. It is specifically agreed and understood that this Agreement shall not be binding upon the Parties until the date it is actually signed by Lender and Borrower, and that shall be the effective date of this Agreement.

**BORROWER:**
**PRESCIENT INVESTMENT LIMITED**

Signature

Name          Yip Wai Man

Title          Director

Date          31-5-2018

Witness

R00034

**LENDER:**

**AMERICA 2030 CAPITAL LIMITED**

_____

Signature

_____VAL SKLAROV_____

Name

MANAGING PARTNER

Title

JUNE 5, 2018

Date

_____

Witness

R00035